UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT BELFORD,                    )
                                   )
            Petitioner,            )
                                   )
      vs.                          )          Case No. 4:03CV613 RWS
                                   )
DON ROPER,                         )
                                   )
            Respondent.            )

## MEMORANDUM AND ORDER

Petitioner Robert Belford was convicted by a jury in the Circuit Court of the City of St.

Louis, St. Louis, Missouri, on two counts of first-degree assault and two counts of armed criminal

action. The charges arose out of the April 16, 1996 shooting of Ernest Lloyd.

Belford was sentenced to a term of imprisonment of 30 years on each of the four counts.

The sentences were ordered to be served concurrently. Belford's convictions and sentences were

affirmed on direct appeal. Belford's motion for state post-conviction relief was denied after an

evidentiary hearing. The denial was affirmed on appeal.

This matter is before me on the petition of Belford for a writ of habeas corpus pursuant to

28 U.S.C. § 2254. I will deny Belford's petitions because the state court proceedings did not

involve an unreasonable application of clearly established federal law.

## BACKGROUND

Belford and co-defendant Kevin Smith were tried and found guilty arising out of the April

16, 1996 shooting of Ernest Lloyd.[1]

---

[1]Prior to trial, defense counsel moved for the court to make an order pursuant to Supreme Court Rule
24.06 granting a severance of Belford's trial from that of all other defendants in the case. The court denied
Belford's motion based upon the State's declaration that the co-defendant's statement which implicated Belford

## Evidence at Trial

At trial, the State presented evidence that on April 16, 1996, Gregory Lamont Hall, Ernest Lloyd, and Timothy Graves were walking together on the street when they met Kevin Smith. Graves knew Kevin Smith from their old neighborhood. Lloyd and Hall continued walking, with Graves and Smith following approximately one half block behind. A few minutes later, Graves looked up and saw a man, later identified as the petitioner, Robert Belford, walk between Hall and Lloyd. Tr. 419-22, 449.

Hall testified that Belford approached Lloyd and him and began swearing at them. Hall noticed that Belford had a gun and told Belford that there was no need for that. Belford responded by kicking Hall and continued swearing at both Hall and Lloyd. Tr. 497-98. Meanwhile, Graves and Smith ran up to the scene. Graves stopped when Belford pointed the gun at him and told him to get away. As Graves backed away, Belford shot at Hall. Belford's shot missed Hall. Kevin Smith then hit Lloyd twice on the back of the head with his fist. After he was hit by Smith, Lloyd "balled up." Belford told Smith to start running. Belford then shot Lloyd. Lloyd fell to the ground and Smith and Belford ran away. Tr. at 424-28, 498-500.

Graves called the police who arrived at the scene. Lloyd, who had been shot once in the head and once in the leg, was taken to the hospital. The bones in Lloyd's face were crushed as a result of falling after being shot. Tr. at 410. Lloyd had reconstructive surgery on his face, and at the time of trial was taking drugs to prevent seizures, could no longer operate a motor vehicle, and needed a cane to walk. Tr. at 411-12. Graves and Hall were later taken to the police station where they were each shown a photograph spread of six photographs and were asked to identify the assailants.

---

would not be used at trial. Resp. Ex. B.

The state presented the testimony of Officer Campbell, who arrived at the scene of the crime shortly after the shooting. Officer Campbell testified regarding what he learned from his investigation. Defense counsel made a hearsay objection to the officer's testimony. The trial court overruled this objection. Over counsel's objection, Officer Campbell testified that through his investigation at the scene of the crime he "learned of two names of possible suspects who had been involved in the incident." Tr. at 341. After he finished his review of the crime scene, the officer interviewed Hall and Graves. The officer also prepared a photo spread which included six photographs to be viewed by Hall and Graves. Tr. at 342-344. Hall positively identified Smith and Belford as the individuals involved in the shooting. Graves also positively identified Smith as a person involved in the physical assault. Graves also tentatively identified Belford as the shooter. Tr. at 344-48. On cross-examination, Officer Campbell stated that neither witness identified Smith as the person having a gun on the day of the shooting. Tr. at 349.

The State introduced into evidence the LID photographs of the two defendants, which were redacted to cover information other than the photographs, in accordance with the ruling on a motion in limine.[2] Tr. at 344. The State also presented the testimony of another police officer, Officer Timothy Kaelin, who was involved in showing the photo spread to the witnesses. Officer Kaelin stated that he and Campbell had "obtained the photographs of the suspects from the record room, and then we had numerous LID photographs in our homicide office from other incidents, and we obtained that particular group." Tr. at 354. Counsel for both defendants

---

[2] Prior to trial, defense counsel moved to exclude any information or testimony to the effect that the "LID photograph" of Belford used by the police in the photograph spread for identification purposes was a "mug shot." Counsel argued that such a reference would constitute evidence of other crimes and unfairly prejudice Belford. The court ruled that the LID photograph could be used in court but that the State had to cover or redact any information which related to Belford's prior criminal history. Defense counsel then asked that the police officers who testify about the photograph spread not refer to the photographs as "mug shots." The court stated "I don't know what their lingo is, but whatever they refer to them, that's what it is." Defense counsel suggested that the officers should just call them photographs and the court stated, "All right, let's move on to [the next point]." Tr. at 25-26.

objected to this testimony and moved for a mistrial. Tr. at 355-356. The court overruled the motion for mistrial without giving a reason, and the trial proceeded. Tr. at 357. The following morning defense counsel renewed the motion for a mistrial based on Officer Kaelin's testimony. In support of the mutual motion, defense counsel argued that the testimony was a clear reference to evidence of other crimes. The trial judge found that Officer Kaelin's testimony taken as a whole did not prejudice the defendants because it was reasonable to infer from the testimony that the other four LID photographs were taken from the homicide office but not those of the defendants. Tr. at 372-82. Both Graves and Hall identified Smith in court as the person who punched Lloyd before Belford shot him. Tr. at 420, 506. During the State's redirect of Timothy Graves, the State elicited testimony that Kevin Smith had said, "What's up with my homeboy." Belford objected to this testimony as hearsay and renewed his request for severance as the statement was not admissible against Belford. The trial judge allowed the line of questioning to continue, finding that the Belford had opened the door to that line of questioning.

Belford presented an alibi defense that he was playing basketball at the Dunne Marquette Recreation Center and later went to Baden, Missouri during the afternoon and evening of April 16, 1996. To support this defense, Belford called his girlfriend, Tawana Harris, his friend, Pertonia Williams, his cousin, Sterling Jones, and the recreation coordinator of the Dunne Marquette Recreation Center, Kathleen Hanrahan. Tr. at 558-620. As part of his testimony, Sterling Jones traced the route that he and Belford had allegedly taken home after the gym. Tr. at 594. During the State's cross-examination of Sterling Jones, the State accused Jones of offering an alibi for Belford because Jones didn't want to see him go to jail. As further proof of that underlying motive, the State asked, "In fact, you don't want to see him go to jail so badly that, isn't it a fact that you offered money to a relative of Gregory Lamont for him to lose faces?"

Defense counsel objected and requested a mistrial, arguing that there was no way the prejudice could be cured. Tr. at 608. The State argued that the question was intended to elicit bias as a means of impeaching Jones; however, the court sustained the objection but did not grant a mistrial.

As part of the jury instructions, the court instructed the jury that:

You must not assume as true any fact solely because it is included in or suggested by a question asked a witness. A question is not evidence, and may be considered only as it supplies meaning to the answer.

. . .

If the Court sustains an objection to a question, you will disregard the entire question and you should not speculate as to what the answer of the witness might have been.

Jury Instruction No. 2.

Additionally, during deliberations, the jury requested the map used by Jones in his testimony. However, the court noted that the map was used for demonstrative purposes only and was not offered into evidence. Therefore, the jury was not provided with the map. Tr. 717-718. At the conclusion of deliberations, the jury found Belford guilty of two counts each of Assault First Degree and Armed Criminal Action. Belford made a Motion for a New Trial, which the trial court denied. Resp. Ex. B.

**Direct Appeal**

Belford raised five issues in his direct appeal of his state court conviction. Belford argued that the trial court committed reversible error erred in the following ways: (1) overruling Belford's hearsay objection and permitting the State to elicit Officer Campbell's testimony that he learned of "the two names" through his investigation, (2) overruling Belford's objection and denying his request for mistrial when Officer Kaelin testified that he retrieved photos used in the photo line up from the homicide department, (3) permitting the State to display un-redacted LID

photos before the jury, (4) denying Belford's request for a mistrial when the State accused defense witness Sterling Jones of offering money to a relative of Hall, and (5) denying Belford's renewed request for severance after the State produced Grave's testimony that co-defendant Smith said "What's up with my homeboy."  Resp. Ex. C.

The Missouri Court of Appeals affirmed Belford's convictions and sentences.  The state appellate court denied the appeal based on Belford's objection to Officer Campbell's testimony finding that, in light of the evidence of identification, Belford was not prejudiced by this statement, and that out-of-court assertions are admissible for non-hearsay purposes to show why an investigation focused on a certain person.  The state appellate court denied the appeal on point two, finding that the trial court judge was clear as to why he overruled Belford's motion for mistrial, and the trial judge did not abuse its discretion in so doing.  The state appellate court then found that because the incriminating information on the LID photos was at all times obscured by post-its and was not given to the jury until the information was properly redacted, the trial court did not abuse its discretion.  In denying Belford's fourth point, the state appellate court noted that the trial court properly instructed the jury, and it is presumed that jurors properly follow the court's instructions.  Finally, the state appellate court rejected Belford's last point because the court held that Belford was not implicated by co-defendant Smith's statement.  Resp. Ex. E.

**State Post-conviction Proceedings**

Belford filed a post-conviction petition on February 24, 2000, and an amended motion on October 23, 2000, alleging ineffective assistance of counsel for: (1) failure to call Thomas Howard and Lamar Gayfield as alibi witnesses, (2) failure to cross-examine Graves regarding a prior controlled substance conviction, and (3) failure to introduce into evidence a map of the city of St. Louis.

**Evidentiary Hearing**

At the post-conviction hearing, Belford called Lamar Gayfield and Theodis Howard to testify, and Belford also testified on his own behalf. The State called Elizabeth Haines, Belford's trial counsel.

Gayfield testified that he had known Belford for about fifteen or twenty years. Gayfield testified he was playing basketball on April 16, 1996, at the Marquette-Dunn Center around 2:00 p.m. and that Belford played with him that day and played the whole game. Gayfield stated that the first time he was contacted to testify on Belford's behalf was for the post-conviction hearing, and that he would have been willing to testify if he had been called to do so at trial. Resp. Ex. H at 7-9.

On cross-examination, Gayfield stated that he and Belford grew up in the same neighborhood and that he would see Belford at the gym about four times a week. Gayfield testified that Belford did not know his address, had never been to his house, and never called him on the phone. Gayfield stated he became aware of Belford's arrest around 1998, when Belford stopped coming to play basketball. Id. at 10-14.

During re-direct, Gayfield stated that Belford did not know Gayfield's phone number, but did know he played basketball everyday. Finally on re-cross, Gayfield clarified that he usually played basketball four days a week, but during April and March of 1996, he played practically every day because during that time he was unemployed. Id. at 14-15.

Belford's second witness, Theodis Howard, testified that he knew Belford because they grew up in the same housing project. He testified that during 1996, he typically played basketball Monday through Thursday, because that was when the center was open for "pick-up" basketball games. He stated he played on April 16, 1996 from two to four o'clock. Howard stated Belford

was on his team for the duration of that afternoon's game on April 16, 1996. Howard also testified that he was never contacted during Belford's trial, but he would have been willing to come in and testify for Belford had he been called to do so. Id. at 18-20.

On cross examination, Howard conceded he did not know what he had been doing on April 15 or 17 of 1996. He then stated that Belford had been to his house a few times but never contacted him on the phone. Howard testified that he found out about Belford's confinement about a month after the arrest but made no effort to contact Belford's lawyer because he did not know why Belford was arrested. Id. at 21-24. On re-direct, Howard said he believed his memory of the events would have been stronger had he been contacted at the time of Belford's trial in 1998. Id. at 24. On re-cross, Howard testified that he knew a lot of Belford's friends but after learning of Belford's arrest, he made no attempt to contact Belford's friends or relatives. Id. at 25.

Belford also testified at his post-conviction evidentiary hearing. Belford testified that before the trial he gave Howard's name and address and Gayfield's name to his trial attorney, Elizabeth Haines. Belford testified he gave Howard and Gayfield's information to his trial attorney because Howard and Gayfield were at the gym playing basketball with Belford and could provide alibi testimony relating to his whereabouts on April 16, 1996. Belford testified that Haines told him she had an investigator looking for them, and that it was her intention to call them as witnesses. Haines did not mention the two potential witnesses again. Belford stated that he asked Haines whether she had contacted all of his witnesses. Id. at 29-31. On cross-examination, Belford conceded that the witnesses called for him at trial testified regarding the same alibi testimony that Gayfield and Howard would have provided. Belford also testified that because he did not drive he did not know what time he arrived at the recreation center on April 16, 1996.

Belford testified that he knew he left the recreation center when the center closed at 4:00 p.m. Id. at 34 - 35.

The State also called Belford's trial attorney, Elizabeth Haines, to testify. She stated that her investigator spoke with Howard, but that Howard indicated he did not remember anything about the day in question, and based on that response, Haines decided not to call him at trial. Haines then testified that she tried the phone number Belford provided for Gayfield, but the number was disconnected. On cross-examination, Haines testified that after she discovered Gayfield's number was disconnected, she discussed the matter with her client. Haines stated she did not call the telephone company for Gayfield's number, ask other witnesses if they knew how to get a hold of Gayfield, or ask anyone at the recreational center if they knew how to get in touch with him. Haines testified she was aware of the relationships between the witnesses, that she did call to corroborate Belford's alibi defense at trial, and that she was aware neither Gayfield nor Howard was related to Belford. Id. at 41-45.

Haines testified she was aware that Graves had prior convictions for drug distribution, but she did not introduce the possibility that Graves was shot at by someone else because of drug dealings instead of the result of the turf war as suggested by the State. Finally, Haines stated she tried to establish for the jury that Belford could not have done the crime because he was not in the area at the time. Id. at 52. Haines clarified that the jury could not examine a map she used at trial during their deliberations because it had not been received into evidence. Id. at 49-53.

On re-direct, Haines testified that during the trial, Jones went through the map of St. Louis and his route very slowly and specifically for the jury. She then recalled that she did bring out in front of the jury that Graves had previous convictions for drugs. Haines then stated she did not remember if she asked the recreational center for addresses of Howard or Gayfield. On

-9-

re-cross, Haines stated that there were occasions where she had revisited prior convictions of a witness even if it were brought out on direct examination. Finally, on further re-direct, Haines stated that she did investigate the case and review the file before going into trial. Id. at 54-60.

**Decisions of Motion Court and Missouri Court of Appeals**

The motion court found that Belford's counsel was not ineffective for failing to call Gayfield and Howard as witnesses because their testimony would have been cumulative, and trial counsel's reason for not calling Howard was reasonable. The motion court then found counsel was not ineffective for failing to cross-examine Graves regarding a prior guilty plea of delivery of a controlled substance because the prosecutor had already elicited such testimony and because the remote guilty plea would not have changed the outcome of the trial. The motion court also found that Belford's trial counsel was not ineffective for failing to introduce the map into evidence because the map was used during testimony of Jones, and the court did find that the inability of the jury to view the map during deliberations would not have had any impact on the verdict. Resp. Ex. I at 64-68.

On appeal, Belford raised only points one and three: failure to call Thomas Howard and Lamar Gayfield as alibi witnesses and failure to introduce into evidence a map of the city of St. Louis. The appellate court affirmed the motion court on both points. The state appellate court held that trial counsel's decision not to call Gayfield and Howard was not ineffective assistance. The court noted that Belford did not provide trial counsel with another means by which to contact Gayfield after it was discovered his phone was disconnected. Belford failed to show that Gayfield could have been located by reasonable investigation, and trial counsel cannot be held ineffective by failing to call a witness who could not be located. Further, the court stated that trial counsel's

decision to not call Howard was clearly a matter of trial strategy, as trial counsel's investigator reported that Howard "did not remember anything."  Resp. Ex. L at 3.

The state appellate court went on to say that Belford failed to show he was prejudiced by counsel's failure to call the witnesses.  These witnesses would have testified that Belford was playing basketball at the time of the alleged crime, but this testimony was duplicative of testimony already presented to the jury.  The state appellate court then stated that Belford's argument that these statements would not be cumulative was "misguided."  The court stated that because these witnesses grew up with the Belford, the jury could have viewed them as having an equivalent amount of bias as the other alibi witnesses.  Id. at 4.

The court affirmed the motion court's ruling on point three as well.  The court found that trial counsel was not ineffective for failing to enter the map into evidence because the map was cumulative of  Jones's testimony.  The court stated the map would not have strengthened Belford's theory as it had been thoroughly examined during Jones's testimony.  Because failure to introduce cumulative evidence is not grounds for a claim of ineffective assistance of counsel, and because Belford failed to show how he was prejudiced by failure to introduce the map, the state appellate court denied the second point.  Id. at 4-5.

## DISCUSSION

### Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court adjudication

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

The "contrary to" clause is satisfied if a state court has arrived "at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrives at the opposite result. Price v. Vincent, 123 S. Ct. 1848, 1853 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413; Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003).

A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be "unreasonable." Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is both wrong and unreasonable"). The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to "an even more deferential review." Id. Factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only by "clear and convincing evidence." Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001); § 2254(e)(1). The summary nature of the state appellate court opinions does not affect the standard of review. James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999), cert. denied, 528 U.S. 1143 (2000).

**Belford's Claims**

In the present action, Belford asserts that his constitutional rights were violated in the following ways:

(1)     Defense counsel rendered ineffective assistance in failing to investigate and call witnesses who would have bolstered Belford's alibi defense;

(2)     Defense counsel rendered ineffective assistance in failing to present evidence in the form of a map of the city of St. Louis which would have bolstered Belford's alibi defense;

(3)     The trial court improperly allowed a police officer, Detective Ralph Campbell, to testify that he learned of "two names" for the suspects from a confidential informant, as this constituted impermissible hearsay;

(4)     The trial court improperly allowed another officer, Detective Timothy Kaelin, to refer to photos of Belford as coming from "numerous LID photographs in our homicide office from other incidents" and allowing the jury to see information on the photos;

(5)     The trial court improperly failed to grant a mistrial after the prosecution accused a defense witness, Sterling Jones, of attempted witness-tampering , when the prosecutor had no evidence connecting Belford to the conduct and she did not inform defense counsel of the information; and

(6)     The trial court improperly refused  to sever Belford's trial from that of co-defendant, Kevin Smith.

Roper argues that habeas relief should be denied because the state court's adjudication of Belford's ineffective counsel claims was not contrary to or an unreasonable application of clearly established federal law.

In response to Belford's confidential informant claim, Roper argues that the state court's determination that the out-of-court assertions were not hearsay should be presumed valid as a matter of law and that even if allowing such testimony was an error, it was a harmless one.  Roper further argues that Belford's claims regarding use of the photographic evidence are unfounded because the use of the photos did not suggest previous criminal activity and the information on the photos was redacted prior to publication to the jury.  In response to Belford's mistrial claim, Roper argues that Belford failed to exhaust his remedies with respect to this claim, and regardless, he failed to show that he was prejudiced.  Finally, Roper argues that Belford's severance claim

should not be cognizable by this Court because it is a state court's decision based on state law, and even if it were a federal claim, that Belford was never identified or named by his co-defendant so there is little risk that it prejudiced Belford's case.

**Ineffective Assistance of Counsel**

Belford's first claim is that trial counsel was constitutionally ineffective in failing to present witnesses that would have corroborated his alibi defense. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish both "that counsel's representation fell below an objective standard of reasonableness," and that but for counsel's deficiency there is "a reasonable probability" that the result of the trial would have been different." Id. at 688.

When addressing the adequacy of counsel's performance, a federal district court must be "highly deferential," and make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Odem v. Hopkins, 382 F.3d 846, 850 (8th Cir. 2004) (quoting Strickland, 466 U.S. at 689). There is a strong presumption that counsel's performance fell "within the wide range of professional assistance." Id. "Lawyers are not perfect, and the Constitution does not guarantee a perfect trial." Jones v. Delo, 258 F.3d 893, 902 (8th Cir. 2001); see also Whitfield, 324 F.3d at 1018 (although not perfect, counsel's performance was not constitutionally deficient). "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." James v. Iowa, 100 F.3d 586, 590 (8th Cir.1996). However, "counsel must exercise reasonable diligence to produce exculpatory evidence, and

strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir.1991).

Error by counsel, even if professionally unreasonable, does not necessarily require that a judgment be set aside. "[A] defendant [must] affirmatively prove prejudice . . . It is not enough for a defendant to show that the errors had some conceivable effect on the result of the proceeding . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 698; see also King v. Kemna, 266 F.3d 816, 823 (8th Cir. 2001).

Moreover, in the context of a § 2254 petition, a petitioner "must do more than show that he would have satisfied Strickland's test if his claims were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner." Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 698-99, 152 L. Ed. 2d 914, 122 S. Ct. 1843 (2002)). Accordingly, in the present case, Belford must show that it was objectively unreasonable for the state courts to conclude that (1) trial counsel performed competently, and (2) there was no reasonable probability that competent performance by defense counsel would have resulted in a verdict of not guilty first degree assault and armed criminal action. See Jones, 258 F.3d at 901.

Under the first prong of Strickland, Belford argues that a reasonably competent attorney under the same or similar circumstances would have investigated and called unbiased witnesses to establish the alibi of the client. In particular, Belford argues that a reasonably competent attorney

would have called Thomas Howard and Lamar Gayfield as witnesses because neither man was related to Belford and neither man had the biases of other witnesses called on Belford's behalf at trial. Belford argues that the witnesses trial counsel did call at trial were obviously subject to cross-examination on bias issues and because Howard and Gayfield had no such obvious biases, they would have been more effective in establishing Belford's alibi defense.

I conclude that it was not objectively unreasonable for the state appellate court to decide that trial counsel's decision not to call Howard and Gayfield was a matter of trial strategy and cumulative. Just because it was possible for Haines to call other witnesses, it does not necessarily follow that Haines performed incompetently for failing to do so. Belford has not shown that it was objectively unreasonable for the state courts to conclude that Haines's decision to not call these witnesses rose to ineffectiveness. Further, Belford has failed to demonstrate that there is a reasonable probability that calling these witnesses would have likely resulted in a verdict of not guilty. In fact, the state court expressly found that the testimony of these witnesses would not have necessarily led to a different outcome at trial because the testimony was duplicative and the jury could have concluded Howard and Gayfield were equally vulnerable to cross-examination for bias as the witnesses called at trial. Belford has failed to show that this was an objectively unreasonable adjudication of the issue and I will therefore deny Belford's first claim for relief.

Belford next argues that trial counsel was ineffective for failing to introduce a map of St. Louis into evidence. Belford reasons that the map was important to his defense because it would have established that it would have been impossible for Belford to have played basketball at the recreation center, gone to Jones' home, and also have been at the location where the victim was

shot. Belford states that he was prejudiced by trial counsel's failure to introduce the map into evidence when the jury's request for the map during deliberations was denied.

I find that the state appellate court permissibly concluded that Belford's trial counsel was not deficient for failing to introduce a map of St. Louis into evidence. Introduction of the map would not have strengthened Belford's theory because it was cumulative of Jones's testimony. Belford has also failed to "show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland at 694. I believe that the state court's adjudications of these claims were a reasonable application of Strickland. I will therefore deny Belford's second claim for relief.

**Impermissible Hearsay**

Belford's third claim asserts that he was denied his rights to due process, confrontation, and a fair trial in violation of the Sixth and Fourteenth Amendments of the United States Constitution when the trial court allowed Detective Campbell to testify that he learned of "two names" for the suspects through his investigation because this constituted impermissible hearsay which Belford had no opportunity to confront. "[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." Pointer v. Texas, 380 U.S. 400, 404 (1965). Belford argues that the testimony by Detective Campbell clearly related purported statements of an out of court witness, violating Belford's right to confront that witness.

When conducting a habeas review, a federal court can only decide whether "a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). It is not for a federal court "to reexamine state-court determinations on state-law questions." Id. Habeas relief is justified only when an evidentiary ruling is "so grossly

prejudicial that they fatally infect the entire trial, preventing it from being fundamentally fair."

Henderson v. Norris, 118 F.3d 1283, 1286 (8th Cir. 1997). The petitioner must show that

"absent the alleged impropriety the verdict probably would have been different." Gee v. Groose,

110 F.3d 1346, 1350 (8th Cir. 1997) (en banc).

I do not conclude that the state appellate court's decision was unreasonable. On direct

appeal, the Missouri Court of Appeals, Eastern District, denied Belford's claim that the out-of-

court statement was impermissible hearsay on the basis that "[out-of-court statements that explain

subsequent police conduct] are admissible for non-hearsay purposes to show why an investigation

focused on a defendant." State v. Howard, 913 S.W.2d 68, 70 (Mo. App. E.D. 1995). Belford

has failed to rebut the presumption that this factual finding by the state court was correct. 28

U.S.C. § 2254(e)(1) (presuming that a determination of a factual issue made by a State court is

correct). The out-of-court statement was not being used to prove the truth of the matter asserted,

but rather was used to demonstrate why the police investigation focused on Belford as a particular

suspect. As such, because the out-of-court statement was not hearsay, there is no basis for a

Confrontation Clause claim. As a result, I will deny Belford's third claim for relief.

**Photographic Evidence**

In his fourth claim, Belford argues that he was denied his right to a fair trial and Due

Process rights in violation of the Sixth and Fourteenth Amendments of the United States

Constitution when the trial court allowed Officer Kaelin to testify that he had retrieved pictures

for the photo line up from the Police Department's homicide division. Belford argues the same

rights were violated when the trial court permitted the prosecutor to display mug shots with

yellow post-its that did not conceal the information on the photo, thus negating any non-criminal

explanation the jury could have perceived for Belford's photo to be on file with the police.

Belford contends that Officer Kaelin's testimony and the use of the unredacted photos informed the jury of Belford's criminal history and that this impaired the presumption of innocence required in receipt of a fair trial. Belford also contends that the error was not harmless because the issue of identification was pivotal in this case.

I do not find that the state appellate court's decisions were unreasonable. Officer Kaelin's passing comment did not link Belford to homicide, and a reasonable jury could have interpreted the comment to mean that some of the photos, but not Belford's, were from the homicide department. Furthermore, there were no additional comments made linking Belford to other homicides or prior bad acts. I do not find that one reference to the source of the LID photos infected the entire trial with prejudice, such that absent the challenged comment the verdict would have been different. See Young v. Bowersox, 161 F.3d 1159, 1161 (8th Cir. 1998) (prosecutor's question improperly suggesting to the jury that habeas petitioner had prior bad acts did no violate petitioner's right to a fair trial where question did not refer to any specific past acts or indicate what the circumstances surrounding those acts might be, and evidence of petitioner's guilt was strong); Loggins v. Hannigan, 2002 WL 1980469, at *2 (10th Cir. 2002) (witnesses's references to habeas petitioner's mug shots did not violate his right to due process in light of the overwhelming evidence against him).

The mug shots introduced at trial had information relating to Belford's prior bad acts covered by post-its. Furthermore, the information was redacted before given to the jury. The jury never had access to the information that Belford claims removed a presumption of innocence. Belford has failed to establish that admission of the mug shots effected the outcome of the whole trial. I will deny Belford's fourth claim for relief.

## Evidence of Witness Tampering

Belford's fifth claim asserts that he was denied his right to a fair trial and Due Process rights in violation of the Sixth and Fourteenth Amendments of the United States Constitution when the trial court refused to grant a mistrial after the State accused defense witness Jones of offering money to a relative of Hall to influence the testimony against Belford. Belford argues that the State had no evidence connecting him to the alleged witness tampering and the State deliberately withheld the information the prosecutor claimed to have on Jones.

Belford supports his claim with the finding in State v. Hicks, that if a person other than the accused threatens a witness to induce false testimony, evidence of such threats are clearly improper and inadmissible unless it can be shown that the threats were made at the behest of the accused or with his consent and knowledge. 535 S.W.2d 308 (Mo. Ct. App. 1976). The State argues that it had a good faith basis for asking the question in order to show Jones' bias and motive to lie to protect Belford. Additionally, the State argues that the trial court's jury instruction stating that a question is not evidence would be sufficient to remedy any possibility of prejudice the question may have had.

Jurors are presumed to follow their instructions. United States v. Griffith, 301 F.3d 880, 884 (8th Cir. 2002). The trial court instructed the jury that it was not to consider a question as evidence and was to disregard the entire question if the court sustained an objection on that question. The jury is presumed to have followed that instruction and Belford did not therefore suffer prejudice as a result of the State's questioning of Jones. I will deny Belford's fifth claim for relief.

**Severance of Trial**

Belford's last claim is that his right to confrontation and right to due process were violated when the trial court refused to sever the trial between him and co-defendant Kevin Smith. Belford argues that Grave's testimony concerning Smith's statement "What's up with my homeboy," compelled severance. Belford argues that severance was required because the statement was admissible only against Smith, and Belford had no opportunity to cross-examine Smith concerning this statement, violating his right to confrontation. Belford argues that because the jury could not have been expected to compartmentalize the evidence as it related only to Smith, he was denied the right to a fair trial.

Habeas relief for a state court's failure to grant severance is only appropriate where a petitioner can show that the failure to grant such relief rendered his trial fundamentally unfair. Hollins v. Dep't of Corrs., (8th Cir. 1992) 969 F.2d 606, 608. The Supreme Court held in Bruton v. United States, 391 U.S. 123, 135-36 (1968), that a defendant's right to confrontation was violated where the trial court admitted a non-testifying co-defendant's statement that inculpated the defendant. Later, the Supreme Court held that a confession by a co-defendant that inculpates the defendant only through inference does not violate Bruton. Richardson v. Marsh, 481 U.S. 200, 208. The Eighth Circuit has recognized that severance is not required merely because evidence is admissible only against one defendant. United States v. Knife, 592 F.2d 472 (8th Cir. 1978). "Severance becomes necessary where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants." United States v. Losing, 560 F.2d 906, 912 (8th Cir. 1977). Therefore, Belford must prove that the jury could not have been expected to compartmentalize the inculpatory evidence against only Smith, thereby making his trial fundamentally unfair, violating his Constitutional rights.

Here, the State used the statement to establish accomplice liability with regards to Smith. Furthermore, it is clear that the statement at issue made no specific reference to Belford, as "homeboy" could have referred to anyone. Therefore, the statement did not inculpate the Belford in violation of <u>Bruton</u>. Belford has also failed to establish that a jury could not be reasonably expected to use the evidence against only Smith. Because the refusal of severance did not result in a fundamentally unfair trial, I will deny Belford's sixth claim for relief.

## CONCLUSION

Based on the foregoing, I find that Belford is not entitled to federal habeas relief.

I have also considered whether to issue a certificate of appealability. To grant a certificate of appealability, I must find a substantial showing of the denial of a federal constitutional right. *See* <u>Tiedeman v. Benson</u>, 122 F.3d 518, 522 (8th Cir. 1997). A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. <u>Cox v. Norris</u>, 133 F.3d 565, 569 (8th Cir. 1997) (citing <u>Flieger v. Delo</u>, 16 F.3d 878, 882-83 (8th Cir. 1994)).

I believe that Belford has not made such a showing on the grounds raised in his petition. Therefore, I will not issue a certificate of appealabilty.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Robert Belford for habeas corpus relief is **DENIED**.

**IT IS FURTHER ORDERED** that I will not issue a certificate of appealability.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 29th day of September, 2006.